16-1729 Good morning, your honors. May it please the court, my name is Sam Angel and I represent the appellant Jerome Gibson. I would request reserving two minutes for rebuttal. That will be granted. Thank you. This is a robbery and a homicide case that's been going on for a number of years now where there is a lot of braided material. You're going to see a lot of braided material in this case. It's going to be a lot of braided material. You're going to see a lot of braided material in this case. It's going to be a lot of braided material in this case. It's The COA granted in this case listed 14 items of braided material. That infected the entire case. That infected the reliability of the Commonwealth case. That discredited the Commonwealth case and not only infected the eight or nine witnesses to which that material relates. Let's assume all that's true. Is it material? Yes, it is. Tell us how. I will. First, the Commonwealth's case had some problems, Your Honor. I'm going to make four points briefly and then I'll go back and touch them. Secondly, because of those problems, they relied on these informant witnesses. Thirdly, the withheld evidence, as I said in my opening, impeached the credibility of the ineffective assistance of counsel claim where trial counsel failed to impeach a witness, the only witness who saw the event, with the fact that he did not ID Mr. Gipsy. Getting to that part of your argument, Mr. Siegel never identified him. What's the beef here? Mr. Siegel's testimony progressively got better. Mr. Gibson is reflecting the record as about 5'4", 120 pounds. At the time of the preliminary hearing of the police, Mr. Siegel's talking about him being 5'8", 150. By the time we get to trial, he's 5'6", 130. Also, as Judge Dalzell noted in the district court, Mr. Siegel's testimony got better in terms of whether there was a gun in the assailant's hand or not. So Judge Dalzell, who even though he denied his belief in this case, said that he thought that the progression was significant. Also, Mr. Siegel's testimony was that Mr. Gibson met the height, weight, complexion, and hair color of the assailant. And thirdly, I've added that there was a Coyber instruction given in this case. The Coyber instruction in this case was that the jury could take Mr. Siegel's and Mr. Colon's testimony with caution if there had been a prior failure to identify. And that's the Coyber instruction. So left out from the jury's determination is this failure to identify at the lineup. And I would submit not only that, but the fact that you have somebody say that he meets the general description. When you have a failure to identify at the lineup, he didn't say that's the guy. And he doesn't say that's the guy at trial. I think strategically, he may have had a problem. When you looked at him at the lineup, what did you think? And he says, well, he looked like the same guy, but I wasn't certain. That could be more damaging than not asking the question you're saying were ineffective. Well, Your Honor, I would just refer Your Honor to the arguments that I made that the counsel, the argument that was not made, or the line of cross-examination that was not made was made with respect to somebody on which the Commonwealth relied, that the testimony increasingly got better for Mr. Gibson. And certainly his height, weight, and hair color and complexion are something that the witness can see at the time. I don't want to dwell on this, but didn't the PCRA court find this procedurally defaulted? I mean, did the district court wrongly consider this claim in the first place? Actually, the Superior Court said it was procedurally defaulted, Your Honor, yes. And then Judge Wells, who's the magistrate judge in this case, she said that that finding of default was improper, that we properly briefed the case. So it was properly before the Superior Court. Moving into the Brady issues, one thing that I'm not quite clear on, maybe you can clarify this for me, why wasn't AEDPA applied? I mean, there were certainly merits determinations on a lot of these pieces of evidence, and yet they applied a de novo standard of review. Why was that? Well, I think both courts decided that they could deny it based on a de novo review. That gives your client the best case scenario, I guess. The higher standard. That's what the magistrate judge said. And I know that there's been no argument on AEDPA from our opponents before this court. So back to material. So here you have a case, Your Honor, where you have a witness who's receiving a payment to provide a statement against Mr. Gibson. $1,500 from the DEA. What does it say in his voucher where he receives that? It says security for a related case. Here you have, not revealed, the same witness, number of incident reports, not arrested, Ed Jones. You run down, there's coercion, battering in somebody's home, terrorizing their mother, Shawn Hess. You have Point Nemour, there's a court order that you get evaluated the day after she gives a statement that shows that she has schizophrenia. Hearing voices, reporting the week before, she said she had a conversation with Mr. Gibson, not reported. So, Your Honor, you have all of this evidence of coercion, which goes to the defense theory that this was a case put together by a giant get-out-of-jail-free card. You have inducement. You have witnesses on the stand saying, I didn't get a benefit. I didn't ask for a benefit. And then the stuff that's withheld shows one or both. And that's important. And you have, I think I have to deal with, there are some witnesses that there's not direct Brady evidence regarding. Some cases they had no evidence. But I think, for instance, with Pamela Harrison, who testified that Mr. Gibson showed up at her house right afterwards and had a gun and that type of thing. The counsel's argument is she was coerced into testifying because her mother was accused by the police of getting the proceeds from the robbery. Getting the proceeds from the robbery. So, evidence of coercion, Shawn Hess' mother was terrorized. That would have supported counsel's argument. Evidence of coercion, that they're threatening Cheryl Thomas. You brought all that out. You're talking about Pamela Harrison. You brought all that out. I mean, that was all part of the case. None of these witnesses were unimpeached at the trial. I think that's probably true. There were some impeached. None were unimpeached. The trial counsel did a good job. I guess what surprised me about that, and I understand the Brady, you know, I understand the sensitivity of the Brady arguments, the importance of the Brady material. But what you had in this case, based on the testimony that's not in question, there's no question that your client was in Bristol Borough. He was that morning. It's disputed whether he was in Bristol Borough that afternoon. That afternoon. There's no question what he was wearing. Actually, Cologne has him wearing yellow pants, which is one of the reasons why he's not believable. He had this, you know, he had this dark hooded sweatshirt. There's a lot of, you know, Mr. Cologne identifies him from across the street. Mr. Cologne. That's it. Mr. Cologne, I'm sorry. Go ahead. Mr. Cologne also is confused. He says he saw him around 2 o'clock. You cross-examined him on that confusion. Well. That was all part of the case. That was in there, but also that the weakness of the case, Your Honor, goes to the materiality of the Brady. His sister talked about him huffing and puffing and sweating. That was Pamela Harrison. Pamela Harrison. Pamela Harrison. Yes. You know, the Bucks County investigators could have provided more information that they didn't, i.e. suppression, that may have been favorable. But I think the whole question here is how does this become material under the standards? You know, is there a reasonable probability of a different result in this case? Yes, there is, Your Honor. And tell us how. Yes, Your Honor. Because in closing, the trial prosecutor is saying, I don't have one, I don't have two, I have nine informant witnesses here. And those nine informant witnesses, did they lie? Not one of them testified that they lied. With respect to two of them, he says, is there any leverage that the Commonwealth has, that the police have against these people? Is there any leverage? Sean Hess and Bernard McClain. Is there any leverage? None. I submit none. That was wrong. That was wrong. And the witnesses are on the stand, and they're saying, I didn't receive Kevin Jones. I didn't get any benefit from this, right? Harold Carroll. Did you get anything from this? No. He's told that when he doesn't want to come to court, arrange a compromise. The Superior Court says, arrange a plea agreement. Right? And it goes on. I mean, isn't the jury going to expect something different from the Commonwealth than putting on witnesses who are paid that it doesn't hear about? Isn't the jury going to expect something different from the Commonwealth than putting on somebody who's schizophrenic and doesn't hear about? How about Mr. Pollard, Your Honor? Mr. Pollard writes the prosecution, and this is when we have the PCRA in 2001. I'm there. Judge Fritsch is there. Judge Gard is there. We're asking for more Brady Evans. 2001, Your Honor. There isn't any. I believe there's not. The Superior Court says, that means the prosecution's belief that there is no more Brady Evans, right? We're asking for, it's denied. Ten years later, Judge Wells has to issue an opinion, an order. Ten years later, telling them to produce it to us. Ten years later. That's true, but again, as Judge Fischer says, Pollard is a guy, you guys really hammered him. I mean, I don't think there was a great deal of force to his testimony by the time you guys got done with him. With all the liars and cooperating with the government and all that. With all the respect, he glossed over that he was getting anything from this. He in fact said, I got a sentence worse than the one I thought I was going to get. That's what he said. And isn't that different? Isn't that different? If your Honor's looking for a letter. Imagine this letter being read to the jury. Hey, Detective Mullen. I just want to make sure that you make sure that you get me to the rehab. I don't like this maximum security play. Oh, and by the way, I kept my mouth completely shut. That infects the entire case. You have, that infects the entire case. You have a lead investigator, in this case, telling a witness to keep his mouth entirely shut. And what does he do by the time he gets to trial? He says, I didn't get a benefit. Or he demurs. He's not going to agree he got a benefit. It would have been much better for counsel to have this letter and say, Hey, didn't you say, hey, I'm writing to follow up that letter just in case you forgot. Get me to the rehab, you know? Mr. Engle, you would know the answer I think to this question. Yes, Your Honor. This, the most recent rating material which was provided, where did it all come from? Most of it came from the prosecutor's trial file. It was in the prosecutor's trial file. And not police files? And not police files. There were some presented from Bits of Township, but most of it was the prosecutor's trial file. The memo about Herman Carroll asking for, or being told he could get an arrangement, that's in the prosecutor's file. These letters to their staff at the DA's office. These letters. I don't, I mean it's inconceivable these letters weren't produced from Glenn Pollock. Inconceivable, Your Honor, that they weren't. And then the eight packs of cocaine. That came from the prosecutor's file. One thing, and you might have glossed over it. That's all right. You're on our time. You made an argument about the Bristol Township Police Department. Now they did help out with Eddie Jones. But it seems that you're taking the position, and correct me if I'm wrong, that anything in their files should have been discoverable. Is that fair? Anything that would inform on this case, I think that's fair, Your Honor. And I would refer the court to the Kyle's decision that says that the prosecutor, puts a burden on the prosecutor to produce the evidence that's in the possession of others acting on the government's behalf. And there's no doubt that R.J. Mills, Detective R.J. Mills from Bristol Township was acting on the government's behalf. Even though they were not the investigating agency. Even though they were not. Well, that's not quite true. R.J. Mills provided the gun. It's his bureau that provided the gun. Another detective, the gun that was attributed to the victim. The gun that was stolen. The gun that was, right, the gun that was the victim's gun. That's attributed to the gun. Is that an unreasonable burden under Brady? Not at all. If you're only helping one guy, you're going to charge him with everything in the files as to any witness in another PD's investigation? With all due respect, it's not an unreasonable burden. R.J. Mills was present at council table during the PCRA proceedings. They were very familiar. R.J. Mills wrote a report to the prosecutor about Ed Jones. R.J. Mills produced the gun. And another Bristol township, so it's not just R.J. Mills. Another Bristol township detective testified in trial about the recovery of the gun. So, if I can get back to the materiality. I think one of the problems that I haven't talked about is that the prosecutor opened that this is a case about getting a car. This is a case about a guy who needed a car, who stole money to get a car. Well, there's a problem with that. The problem is that the evidence was that the money taken was $1,400. How much does the car cost? $400. What does Mr. Gibson do in the prosecution's case the next day? He goes to Frank Shaun Hess and says, I need another $100. That's a problem with the case. Well, he blew the money. There's no evidence of that. That would be a burden on the Commonwealth, Your Honor. No evidence of that whatsoever. In fact, one of the Commonwealth witnesses said he didn't have enough money to get him to a club that night. So, there's no evidence of that whatsoever. So, that's a problem. Mr. Siegel's testimony is a problem. Mr. Colon's testimony is all over the place. It's a problem. The coercion of Pamela Harrison, that's a problem. So, what happens is you get this parade of informants and the prosecutor is vouching for them. And a number of them are denying that the guy had benefited from relief. So, is it your position that the government knew about this and that withstanding the fact that they knew it, they put these witnesses up there, withheld Brady, and then vouched for him? In the face of Brady material that wasn't turned over? In some instances, yes, Your Honor. In some instances, yes, Your Honor. In which instances? Harold and Carol, in the file. Glenn Pollard, in the file. In the prosecutor's file. So, they put these witnesses up. Didn't turn over the discovery. And argued inconsistent with the Brady material. And it continued into the PCRA, Your Honor. It continued when Detective Mullen says, well, why do I trust Glenn Pollard in this case? It's because he didn't ask for anything. Well, right there in the prosecutor's file, in 2001, is a letter from Glenn Pollard to Detective Mullen asking for something. I submit this is a house of cards. And if you start pulling one string or a thread bare suit, if you start pulling one thread, you think it comes down. Why did the prosecutor? The prosecution chose its case. The prosecution chose to put on these number of witnesses. They chose to put on nine witnesses. They chose to put on nine witnesses. And they withheld information that would have shown that what they were saying should not be credited, Your Honor. Thank you. Thank you very much. Thank you. May it please the Court, Steve Harris from the Bucks County District Attorney's Office. I think I should start by saying it's our position that this material that was turned over is not all Brady material. We scoured every conceivable file that we could scour to come up with the documents that we came up with. What do you mean by that? What I mean by that is that the document, some, some, well, that's a different issue than materiality as we'll discuss as we go along. But not every document that was produced is a document that was favorable to the defendant. I understand that. So that's why I'm saying that it's not all documents. How do you know that if you don't know the theory of the defense? Is it the government's decision, well, this may or may not be Brady, and if it's not Brady, in my world view, I'm not turning it over? Well, sure, you have to make, the prosecutor has to make a decision that this material is either helpful, favorable to the defendant in which you have to turn it over, or it's not favorable to the defendant in which you have to turn it over. Let me ask you, of the material that was not turned over that we have now, what did the government decide was not Brady? Well, let me go back and point out that a lot of this material, and I disagree with Mr. Engel, all of it came, or the majority of it came out of the district attorney's file. This came from other police departments, from Bristol, etc. Now, Judge Gauzel said, I believe that they were part of the investigation. We disagree with that. However, that's what the judge found, and I think we're bound by that statement, because the test here is clear, is whether or not the findings of fact that Judge Gauzel made were clearly erroneous. Now, I don't think that I can say that his finding that the departments were working together was, quote, clearly erroneous. But I also don't think that while that was a vigorous argument by the appellant, that any of Judge Gauzel's findings of fact were clearly erroneous. He gave the appellant in this case every benefit of the doubt. We happen to think that Magistrate Wells' decision was the correct one, but Judge Gauzel went and said, look, I'm going to find that these agencies were working together and they were one outfit. I'm going to find, and he made every finding that he could make in favor of the appellant. And then he said, why didn't you argue, because we've seen your briefs, why didn't you argue that EDPA applies at least to some of the things that weren't procedurally defaulted? All that I can say, Your Honor, is if I had written the brief, that's exactly what I would have done. But we took the position that we're not, the position we've taken is, look, we're content to let the court take, if you will, the worst view of this, set the highest bar, and even if you do that, this evidence was not material. Did you say that anywhere in your briefs? That it was not material? Yes. No, that EDPA should apply, but we're going to begin. Is that forfeited then, the argument? And is it forfeitable? I don't think it's forfeitable, but I will tell you it's not in our brief. I was given the brief, and I was told to come to the Third Circuit, and here I am. We're glad to have you. I appreciate that. It's an honor to be here. But my point is, had I made that decision, I would have made that decision, but I didn't. But having said that, the test still is whether there's a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would be different. And there just isn't any, that standard is not met. Judge Dalzell has tested in his opinion very clearly laid out the evidence that you could disregard everything that those nine people said, and you've still got the fact that Vixen was in Bristol Bar that day, a fact that he denied, a fact that was established by the car dealer and by the bank. He denied that he was wearing a dark hooded sweatshirt, which was clearly refuted by the video recording from the bank. The jewelry store owner put him in Bristol Bar shortly before the murder. Mr. Segal, who we've been talking about, clearly saw from across the street the event that happened. And while it is correct that there was no cross-examination about failing to appear at the lineup, the fact of the matter is he was vigorously cross-examined about the different statements that he made on height and weight. All that was brought out. It was brought out on cross-examination that they couldn't, he couldn't be recognized. It was brought out that he had said different height and different weight and all that stuff, so he was vigorously cross-examined on that. Mr. Colon came downstairs and he didn't identify him from across the street. He said he was 20 feet from him. He was right in front of him and he was stuffing a gun in his belt. And that was, and he was, he came down to see what was happening because he heard the gunshots. So here's a fellow between Mr. Segal and Mr. Colon that puts the defendant in the health center firing shots and Mr. Colon immediately recognizes him and testifies to that fact in court. Pam, Paula Harrison, who there's, the argument is that she had mental health problems. That's nothing that we could possibly know. That's nothing that we could possibly know. We're not entitled to have mental health reports. And U.S. v. Polillo says there's no duty to learn of information possessed by other agencies. But that's not something that we could come up with. And Detective Gurgle testified that when he interviewed her, she was lucid, she was responsive, she was appropriate in affect. There was absolutely no evidence of improper demeanor. He told her that he arrived, as you recall, in a dark hooded sweatshirt, sweating and carrying a gun. Bernard McClady admitted that robbery. Don't you have to conceive that knowing that she was hearing voices and having hallucinations and had drug issues and all that, I mean, isn't that an important thing? Wouldn't that be important to the defense? The question, well, the question is whether she was suffering from any delusions or anything like that at the time of the statement. And Detective testified very clearly on this subject that there was absolutely no evidence that she was suffering from any mental illness, that she was not clear in response. At that time, but if you had evidence that she had suffered from mental illness at another time, that information may have been helpful to the defense attorney who may have chosen to use it or not use it. And it is, the impeachment evidence, the impeachment evidence is not sufficient to establish materiality under a Brady violation. So I'm not going to... Is impeachment evidence Brady evidence? Impeachment, well, the test, yes, it is. But the test is whether or not it's material and just because it might help in impeachment and as the panel has already pointed out, there was vigorous cross-examination of each one of these witnesses by John Fairavant. He was an excellent criminal defense attorney and... That's true. We read the record. But, I mean, I think that, you know, what you still have is a conviction by a jury. I'm sure the defense now would say, we wish it was a little more vigorous or we had more to work with. Well, of course. And that's what's being argued here. But the fact of the matter is that there was overwhelming evidence that this man was guilty. I mean, that's what Judge DelZello found. That's not clearly erroneous and that's the test. But Judge DelZello... Judge DelZello found that evidence involving six witnesses satisfied the first two Brady prompts. Yes, he did. Okay. Why isn't the cumulative effect of the evidence involving those six witnesses enough to undermine the confidence in the jury verdict? Well, the test is whether the verdict would be different. The test is whether the verdict would be different. Reasonable possibility that had the evidence been disclosed to the defense, the result of the proceeding would be different. That's the test. So, and Judge DelZello very clearly and in great detail in his opinion went through why the cumulative effect would not have resulted in a different effect. We did say in Dennis that a reasonable probability of a different result is shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. Yes. So, you can pivot back to the reasonable probability standard, but the question for us is what's a reasonable probability? And the question I would suggest that the issue here is that Judge DelZello made findings of fact. He made clear findings of fact in that regard and the test for your review of his findings is whether they were clearly erroneous. And I'll go back to what I said at the beginning. I think he was wrong in saying that Bristol Township and the DEA were part of the same investigative team, but I don't think that's a finding of fact. I have to concede that it's not clearly erroneous. I don't think, well, I think while the Those aren't the findings of fact that Judge DelZello made. So, in looking at this, there was significant evidence of this man's guilt. Therefore, I would argue to you that the testimony was non-material and that Judge DelZello's findings cannot be disturbed, should not be disturbed on appeal because they're not clearly erroneous. I just want to dig down a little further here on one point. The question of where this Brady evidence was, counsel said it was in the prosecutor's file. You disputed some of that. Where would it have been if it wasn't in the prosecutor's file? It would have been in the DEA's file. It would have been in Bristol Township's file. It would have been in the mental health, Bucks County Mental Health's file. So it would have been in the files of other departments. But shouldn't the line prosecutor talk to the folks that are working the case with him and say, hey, do you have any information that I need to know about, about witness X that I'm calling in this trial? Shouldn't he do that at a minimum? Well, we, well, I can't disagree with that statement. However, having said that. So even if they're members of different departments, it's incumbent on the government to make sure that Brady material is requested. Well, the argument, for example, that the first gentleman was paid $1,500 for his testimony, there's no testimony. There's no evidence of that. That's an inference. There's no evidence that that happened. So knowing that a detective is there and a DEA agent is there is not the equivalent of knowing that somebody was paid off. And in fact, there isn't any evidence that he was paid off. There's evidence that he got a check the next day, but he was working as a confidential informant for the DEA. So you can't make that leap of faith. And if there are no other questions, while I would have liked to have seen the other issue raised in our brief, I will say that there is a very detailed discussion of each one of these incidents and whether they're Brady or not, and I rely on my brief in that regard. Thank you.  Thank you, Your Honors. One legal point regarding materiality. It's not a sufficiency test. So in Kyle's, there was Brady as the four eyewitnesses. There were four eyewitnesses. There was Brady as the two, still material. In Dennis, there was nobody materialized to any of the eyewitnesses. The Brady material was still material. And the court's recent decision in Haskell, which was a naked type of case, there was naked evidence as to one of four eyewitnesses, one of four still material. I believe the Commonwealth is wrong about the court's standard of review for Judge Dalzell. It's not clearly erroneous. Judge Dalzell did not hold the hearing, so this court has priority review over Judge Dalzell's decision. In terms of the hooded sweatshirt and the denial of that, Mr. Gibson did not deny that at trial that he had a hooded sweatshirt on. Going back to Mr. Colon, who was mentioned, I would add that he failed to ID Mr. Gibson at a photo ID after the event, and he only identified him after Mr. Gibson's picture was in the paper and he was on the news. That's when Mr. Colon identified Mr. Gibson. With respect to Paulina Moore, the Brady violation is that the Commonwealth didn't turn over a court order that the day after she gave a statement she was ordered to have a mental health evaluation. That would have led counsel to the records that we got. That is a perfect Brady violation. What can lead to Brady evidence is a Brady violation. The Commonwealth didn't raise this, but could they have even turned it over? They could have turned over the court order. Could they have turned it over? They could have turned over the court order. It was in the file. They could have turned over the court order, and then trial counsel could have done what counsel did on Brady's right. Went together. U.S. Parole Law, I submit, is no longer good law after Dennis. With respect to Detective Gergel's statement that Paulina Moore was lucid,  and this evidence would have rebutted that evidence. In terms of the Vigorous Cross Examination, yes, there were a lot of questions that were asked of these witnesses, and they didn't always own up. There's only so much you can do if you don't have all the goods. There's only so much you can do, and if they're denying you got a benefit or they're denying that they asked for a benefit, having this additional material would have been helpful, and showing the jury that these witnesses are not truthful or not credible would have been helpful across the board. It's defendant's burden to put, and I, may I keep going, or would you like me to? You'd better start to sum up. I'll sum up. Defendant's burden is only to show a reasonable probability of a reasonable doubt. That's under the Hinton v. Alabama case, United States Supreme Court case. That is defendant's burden, and I think Mr. Gibson has more than met that in this instance. He acknowledged that probability is a step higher than possibility. I acknowledge that probability is a step higher than possibility. And a reasonable probability even heightens probability more, does it not? Yes, Your Honor, but I think, Your Honor, I would request, and the problem would request that Your Honor consider the circumstances that some of these materials, I don't want to say all of them, some of these materials were in the prosecutor's file. They were withheld for a reason. What's that reason? Why does a prosecutor withhold Glenn Pollard's letter to Detective Mullins and Glenn Pollard's letter to Prosecutor Fitch? Why are they still in there? There's staff there. What is that going to do to impeach this case if the jury learns that a lead detective is telling witnesses to keep their mouths completely shut? Okay. Thank you, Your Honor. Thank you, counsel. And thank you for your excellent briefing and arguments. We'd also like to greet you at sidebar. And actually, I thought I would mention, although we're happy to have everyone here in the courtroom listening, we're especially happy to have our future colleague in the courtroom with us, future Judge Bevis, currently Professor Bevis.